IN RE JANAZIA S.*
(AC 29159)
(AC 29160)

DiPentima, McLachlan and Foti, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued October 24, 2008—officially released January 13, 2009

*David B. Rozwaski*, for the appellant (respondent father).

*David V. DeRosa*, for the appellant (respondent mother).

*Colleen Broderick*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Sonje Williams*, for the minor child.

*Opinion*

McLACHLAN, J. In these consolidated appeals, the respondent father (father) appeals in AC 29159, and the respondent mother (mother) appeals in AC 29160 from

the judgment of the trial court terminating their parental rights with respect to their minor child, Janazia. On appeal, the father claims that the court improperly (1) denied his motion to revoke the commitment of the child to the petitioner, the commissioner of children and families, and to transfer guardianship to the mother or to the maternal stepgrandfather and (2) found that it would be in the best interest of Janazia to terminate his parental rights.[1] The mother claims that the court improperly (1) refused to reopen the evidence for the results of a hair toxicology screening, (2) found that she had failed to achieve sufficient personal rehabilitation, (3) failed to adjudicate her lack of personal rehabilitation before assessing the child's best interest and (4) found that termination of her parental rights was in Janazia's best interest. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the respondents' appeals. When Janazia was born in 1999, the mother was fourteen years old and the father was nearly twenty-five years old. Consequently, in 2001, the father was convicted of sexual assault in the second degree and sentenced to serve seven years in prison, execution suspended after eighteen months, and probation for ten years.[2] Janazia remained with her mother until June, 2002, when police entered their residence and found Janazia alone and the apartment in a deplorable condition. At that time, the mother was arrested on a charge of risk of injury to a child and placed in an alternative incarceration

---

[1] The father does not on appeal challenge the grounds for adjudication in his case and admits that there is no evidence to be offered contrary to the court's findings as to him. Instead, he contends that it is not in Janazia's best interest to terminate his parental rights because placement with the mother obviates the need to terminate his parental rights.

[2] The father was concurrently convicted of failure to appear. He remained incarcerated, except for two brief periods of time, through the date of the judgment in this case.

center. Janazia was placed in the care and custody of the petitioner on an order of temporary custody.

On July 5, 2002, the court, *Brenneman, J.*, issued specific steps for the mother to follow to seek reunification. In October, 2002, Janazia was adjudicated neglected and committed to the care and custody of the petitioner. At that time, the court, *Esposito, J.*, issued additional specific reunification steps for the mother to follow. Janazia has remained in the care of the petitioner since June, 2002.

When the department of children and families (department) became involved in 2002, the father's problems included involvement in criminal activities, imprisonment and a substantial lack of involvement in Janazia's life, even prior to his sexual assault conviction, which resulted in a court order of no contact with Janazia. The father spent the majority of the five years that Janazia was in foster care in the custody of the commissioner of correction.

In September, 2002, the father requested visits with Janazia. Following his release from prison in November, 2002, weekly supervised visits with Janazia were initiated by the petitioner. Those visits stopped in January, 2003, when the petitioner learned that, as a condition of the father's probation, he was prohibited from having contact with Janazia. On April 29, 2003, the court, *Esposito, J.*, determined that continuing efforts to reunite Janazia with the father were not appropriate.

In September, 2006, the father, who was again incarcerated, requested prison visits with Janazia.[3] Janazia's therapist advised the department that such visits should not occur because of the long period of estrangement and Janazia's emotional and behavioral problems. In

---

[3] The no contact order was lifted in 2005.

December, 2006, after being informed that the department would not provide him with visitation, the father mailed the department social worker a letter reflecting his displeasure regarding the denied visitation and including threats of violence.[4] The father's earliest possible release date, as of the date of judgment, was September, 2007.

The mother's problems in 2002 were unaddressed substance abuse, unstable housing, lack of income and inability to parent properly. The mother entered an alternative incarceration center after her 2002 arrest but was discharged in August, 2002, because of a breach of the peace charge. The department referred the mother to the Grant Street Partnership, an outpatient abuse program, but she was discharged in January, 2003, due to noncompliance with the program.[5] The department then referred her to the multicultural ambulatory addiction services program, in which she successfully completed the substance abuse program and parenting classes.

In January, 2004, however, the mother was arrested on a charge of possession of an illegal drug known as illy.[6] Following this arrest, the mother completed a court-ordered drug program at Cornerstone rehabilitation center and the criminal charges were dismissed. In 2005, however, the mother's hair toxicology screening (hair test) was positive for marijuana. The mother was referred to the Central Treatment Unit substance abuse treatment program for treatment and drug testing urinalysis. She was also referred to Outreach and Engagement Project Safe for assistance with transportation

---

[4] The father was convicted of harassing the social worker and received an additional ninety day sentence of incarceration.

[5] Of the fourteen urinalysis screens performed at the Grant Street Partnership, twelve were positive for marijuana.

[6] Illy contains marijuana leaves soaked in formaldehyde and laced with phencyclidine, commonly known as PCP.

and compliance with substance abuse screening and treatment. The mother continued to test positive for marijuana at the Central Treatment Unit. At her request, the mother transferred to the Grant Street Partnership for treatment but refused to submit to urinalysis and was discharged due to excessive absences. The mother was referred to the Connections, Inc., program, a substance abuse center in Middletown, in the fall of 2005, but chose to go to a branch of the Connecticut Mental Health Center (health center) in October, 2005.[7] Upon her enrollment, the mother was diagnosed with depression and began mental health treatment at the health center.

Despite the mother's substance abuse problems, the petitioner continued visitation between the mother and Janazia.[8] Until June, 2006, the permanency plan for Janazia continued to be reunification with her mother. To that end, in January, 2006, the petitioner began to conduct visits between the mother and Janazia in the mother's apartment. During a visit in June, 2006, however, a department case aide supervising the visit found marijuana on the mother's couch. The mother refused to submit to urinalysis at the health center in June,

---

[7] The mother remained a client of the health center from October, 2005, through the date of decision in this case. Although the petitioner believed that the health center was routinely performing urinalysis, the health center's records revealed that the mother was refusing urinalysis, aside from the following tests: December 13, 2005, positive for the active chemical in marijuana, delta-9 tetrahydrocannabinol (THC); September 13, 2006, negative for THC; December 5, 2006, positive for THC; April 17, 2007, negative for THC; and April 23, 2007, negative for THC.

Additionally, while the petitioner believed that the mother was engaged in individual therapy at the health center, the records produced in July, 2006, showed that individual counseling was not taking place.

[8] The petitioner entered into a series of service agreements with the mother to minimize the trauma to Janazia regarding missed visits or late arrivals to visits. The mother was required to call the department by noon the day before a scheduled visit to confirm her attendance; she was then to arrive fifteen minutes early to a visit, at which time Janazia would be brought for the visit.

2006. The mother applied for a job in July, 2006, but was not hired because she failed an employment drug screen. Visitation between the mother and Janazia resumed at the department's office.

In June, July and August, 2006, the mother missed scheduled hair test appointments. In 2007, the department repeatedly requested that the mother submit to a hair test. Although the mother claimed that she had been sober since December, 2006, she continued to refuse to submit to a hair test.[9]

In July and August, 2006, the mother attended only two of eight possible visits with her child. In September, 2006, she attended three of four possible visits; during one of those visits, the mother talked to Janazia about her upcoming birthday and the possibility of a birthday party. The mother, however, failed to follow up on a birthday visit or party and did not acknowledge Janazia's birthday during the next regularly scheduled visit until Janazia asked if her mother had brought her a gift. From October 10 to December 11, 2006, the mother attended only one visit. From mid-December, 2006, through March, 2007, the mother was consistent with visits. Between March, 2007, and the date of the proceedings, the mother attended fourteen of seventeen possible visits.[10]

Following the events of June through July, 2006, and considering Janazia's movement through three foster homes in four years, the petitioner altered the permanency plan from reunification to termination of the respondents' parental rights and adoption. The petitioner, despite that decision, referred the mother to Central Treatment Unit again in September, 2006. The

---

[9] The mother was considering submitting to a hair test at the commencement of the trial but had not submitted to a hair test as of the close of evidence.

[10] The mother was on time for ten out of the seventeen visits.

mother's urinalysis was positive for marijuana in September, 2006, and she subsequently was discharged for nonattendance in November, 2006.

On November 22, 2006, the petitioner filed a petition to terminate the parental rights of both respondents. The petitioner alleged that (1) Janazia had been adjudicated neglected in a prior proceeding and the mother had failed to achieve sufficient personal rehabilitation,[11] (2) Janazia had been adjudicated neglected in a prior proceeding and the father had failed to achieve sufficient personal rehabilitation[12] and (3) the father had no ongoing parent-child relationship with Janazia.

The termination of parental rights trial took place over several dates from May 22 through July 26, 2007. On July 24, 2007, the father filed a motion to revoke the commitment of Janazia to the petitioner and to transfer guardianship to the mother or to the mother's stepfather.[13] The motion was consolidated with the termination of parental rights trial.

Janazia suffered severe emotional and behavioral setbacks in 2006. She had to be removed from two nonrelative foster homes and had to be taken to an emergency room twice, in April and May, 2006, because of her disruptive behavior. Janazia was diagnosed with adjustment disorder with mixed disturbances of emotion and conduct. She had to be medicated and placed in a safe home from March until October, 2006. Janazia resided in a therapeutic foster home from October, 2006, through the date of judgment.

---

[11] The parties repeatedly refer to General Statutes § 17a-112 (j) (3) (B) (ii) in their briefs, but the petition and the judgment were based upon § 17a-112 (j) (3) (B) (i) as the statutory ground for termination.

[12] See footnote 11.

[13] The father's motion was filed in lieu of a motion to change custody to the grandmother of the father's other child, which had been filed on September 27, 2006.

The mother continued to participate in the health center's program for young adults at the time of trial. That program offered her transportation, financial assistance with rent, support of her educational pursuits, mental health treatment and assistance with daily activities such as grocery shopping, managing her finances and keeping her appointments. The program is available to her until she reaches the age of twenty-five, at which time she can transition into the adult program and receive similar services.[14]

The court found that the department had made reasonable efforts to reunite Janazia with the mother. Despite all of the care the mother received after the department became involved, she did not achieve sufficient personal rehabilitation such that Janazia could return to her care. In addition, the court found that the prediction of the mother's nurse that the mother will be self-sustaining in one to two years may be accurate, but for Janazia, her mother's ongoing rehabilitation was not far enough along for reunification to be possible.

Additionally, the court found that Janazia's wait for reunification with her mother and the corresponding lack of permanency caused Janazia's emotional problems. Janazia was psychologically and emotionally battered, she was disruptive in two different foster homes, and she required psychiatric intervention and seven months in a safe home before she could be placed in her therapeutic foster home. The damage that would be inflicted on Janazia from an unsuccessful attempt at reunification would be irreparable. Janazia's needs and best interest mitigated against reunification, both at the time of judgment and in the foreseeable future.

Finding, pursuant to General Statutes § 17a-112 (j) (3) (B) (i), that both respondent parents had "failed to

---

[14] The mother was twenty-two at the time of judgment and will reach the age of twenty-five in 2010.

achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child,"[15] the court proceeded to determine, pursuant to § 17a-112 (j) (2), whether termination of the respondents' parental rights was in the best interest of Janazia.

The court, using the factors outlined in § 17a-112 (k) as a guideline, found the following facts. The department sought to support and encourage the mother's attempts to complete substance abuse treatment and individual counseling. The mother's long and unsuccessful path for substance abuse treatment led her to the health center in late 2005, allowing her eventually to obtain transportation, subsidized housing, monthly financial assistance and assistance with daily activities. In June and July, 2006, however, the department became aware that the mother still was abusing marijuana and could not be employed due to her substance abuse.

Janazia is bonded to the mother but not to the father.[16] Janazia has made tremendous progress since she was placed in a therapeutic foster home in October, 2006. Janazia is bonded to her foster parents, whom she refers to as mom and dad, and has a positive relationship with her five foster siblings and foster grandmother. When Janazia first arrived at her foster home, she would sit in a corner without talking, only screaming and

---

[15] The court also found that the father had no ongoing parent-child relationship with Janazia and that to allow further time for the father to be released from custody and to reestablish a parent-child relationship would not be in Janazia's best interest. See General Statutes § 17a-112 (j) (3) (D).

[16] The mother's extended family members are either unable or unwilling to accept custody of Janazia. The mother's stepfather indicated that he was willing to care for Janazia if she was not adoptable, so that she would not linger in the foster care system, but he did not want to be considered as a placement resource if she could be adopted because he already was caring for a young child belonging to his other daughter.

thumping on the walls. At the time of trial, Janazia was capable of sitting down with the family, verbalizing her problems and writing her feelings. Additionally, Janazia was able to stop taking psychiatric medication. Janazia did not like hearing the word "foster" and considered her foster family her home.

The foster family wanted to adopt Janazia. The foster parents acknowledged the bond between the mother and Janazia, agreed that Janazia wants contact with the mother and were supportive of visits with the mother, so long as the mother's attendance was consistent and timely. Janazia's only memory of the father was seeing him at a park once; otherwise, she never mentioned him to her foster family.

Janazia was nearly eight years old as of the date of judgment. She had been in foster care for five years and deserved to leave the limbo of foster care and obtain permanency in adoption by her therapeutic foster family. The father has continued to make decisions that result in criminal arrests and incarceration. He has not taken any steps to make it in Janazia's best interest ever to be placed in his care. The mother has made some progress, but too much time has elapsed, and Janazia has suffered from too much uncertainty and instability in her young life. Janazia needs permanency as quickly as possible. It is in her best interest to be adopted by her present therapeutic foster family. It is in her best interest to terminate the parental rights of the respondent parents.

On September 5, 2007, the court terminated the parental rights of the respondents, denied the father's motion to revoke the commitment of Janazia to the petitioner and to transfer guardianship to the mother or the mother's stepfather, appointed the petitioner as Janazia's statutory parent and approved the department's permanency plan of adoption.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . .

"A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority, when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence. . . . The question for this court . . . is not whether it would have made the findings the trial court did, but whether in view of the evidence and pleadings in the whole record it is left with the definite and firm conviction that a mistake has been committed. . . .

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by

clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Trevon G.*, 109 Conn. App. 782, 787–88, 952 A.2d 1280 (2008).

General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; [or] (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical,

emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

## I

The father first claims that the court improperly denied his motion to revoke commitment of the child to the petitioner and to transfer guardianship to the mother.[17] Specifically, the father claims that the court's denial was improper because (1) the cause for commitment no longer existed and (2) the mother had demonstrated that she could care for the minor child. We disagree.

Our review of the respondents' claim that the cause for commitment no longer exists is controlled by General Statutes § 46b-129 (m), which provides in relevant part: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child or youth, the court may revoke the commitment of such child or youth. . . ." "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests." (Internal quotation marks omitted.) *In re Sarah S.*, 110 Conn. App. 576, 582, 955 A.2d 657 (2008).

As more fully set forth in parts III, IV and V of this opinion, we conclude that the trial court found properly that the mother had failed to achieve sufficient personal

---

[17] The father's motion requested, in the alternative, that Janazia be placed with the maternal stepgrandfather. On appeal, however, the father has not pursued this argument and, as such, has waived it.

rehabilitation, thus finding that the cause for commitment continued to exist. We also conclude that termination was in Janazia's best interest, thus establishing that continuation of commitment serves her best interest. Accordingly, we affirm the trial court's denial of the father's motion to revoke commitment and to transfer guardianship.

II

The mother's first claim is that the court abused its discretion by refusing to reopen evidence for the results of a yet to be taken hair test. In support of this claim, the mother argues that the court "effectively depriv[ed] the mother of her constitutional right to raise her biological child without knowing, in fact, if the mother was using marijuana."[18]

Additional facts are necessary for the resolution of the mother's claim. In April, 2006, Stacie M. De Grado, a department permanency social worker, asked the mother to submit to a hair test. After initial hesitance, the mother agreed. The mother, however, missed the appointments that De Grado scheduled and did not complete a hair test in 2006.[19] After urinalysis performed by a potential employer indicated that the mother was still abusing marijuana, the mother admitted to De Grado, on July 14, 2006, that she had relapsed. After another failed referral, the department referred the

[18] The mother argues, in part, that "to properly adjudicate whether the grounds for termination exist under General Statutes § 17a-112 (j) (3) (B) (ii), the court must have as much information as possible about the compliance with the specific steps prescribed by the court, including the results of court-ordered drug testing to determine sobriety." Because the court found that grounds for termination existed under § 17a-112 (j) (3) (B) (i), we decline to address this argument.

[19] The mother reported to De Grado at first that she was reluctant because she had braids in her hair that she did not want cut out. In a subsequent conversation, the mother stated that she was concerned for her hair because the last time she had consented to a hair test, a large portion of her hair was removed.

mother to Outreach and Engagement Project Safe. The mother completed an evaluation in October, 2006, but refused the hair test. When a new department social worker, Dino Morbidelli, was assigned the case in March, 2007, he made additional attempts to have the mother submit to a hair test. Initially, the mother refused, but during the last month of trial, she indicated that she would consider taking a hair test.

At trial, the mother admitted that after the positive hair test in 2005, she had refused to take another hair test.[20] The mother also admitted that she had never taken a hair test that was not positive for drug abuse and that she refused Morbidelli's request that she submit to a hair test in April or May, 2007. During examination by the father's attorney on July 23, 2007, the mother indicated she had not used marijuana since December, 2006, and that she would be willing to submit to a hair test and follow any resulting recommendations. When she was questioned by the court about her marijuana use and her decision not to submit to a hair test, the mother's answers were vague and inconsistent.[21]

[20] The mother stated that it was her right to refuse hair tests and that she thought that the random urinalysis was sufficient.

[21] The court questioned the mother as follows:

"The Court: . . . [W]hy have you said no to hair tests up until July of 2007?

"[Mother]: Um, well, I was given that that was my right and I—I, um, stood on that but—

* * *

"The Court: But you wanted to get your child back?

"[Mother]: Right.

"The Court: And [the department] kept asking, didn't they, for a hair test?

"[Mother]: I already taken one before.

* * *

"The Court: You've never taken a hair test that's been negative, correct?

"[Mother]: Right.

"The Court: So, the question is, if you've been clean since December of 2006, we're now at the end of July of 2007, how come you haven't taken a hair test?

"[Mother]: Well, I've just been recently asked to take a hair follicle test.

"The Court: Well, when did [the department] last—before July of 2007, when did [the department] last ask you to take a hair test?

On July 24, 2007, four witnesses testified, including Morbidelli, who stated that he was planning to speak to his supervisor about trying to set up a hair test for the mother. Following the brief testimony of a witness on July 26, 2007, the parties agreed that evidence was closed and closing arguments should begin. After the parties completed closing arguments, the father's attorney requested that the court reopen the evidence in the future if the mother's hair test results were available.[22]

"[Mother]: Um, I don't recall.

"The Court: You have no idea. You don't think if you were clean it was a good idea to take a hair test?

"[Mother]: Well, at the time I wasn't asked to take a hair follicle test up until recently; that is what I'm talking—

"The Court: When was the last time [the department] asked you for a hair test and you said no?

"[Mother]: Uh, it would be last year—

"The Court: So, Mr. Morbidelli testified that you and he talked about hair tests in the past. You had said no, and then you finally changed your mind in July. Is he not accurate in his testimony?

"[Mother]: I guess. I'm not sure.

"The Court: Well, do you recall having a conversation with Mr. Morbidelli about hair tests?

"[Mother]: Yes.

"The Court: Prior to July?

"[Mother]: Yes.

"The Court: Okay. And what—when were those conversations?

"[Mother]: When?

"The Court: Yes.

"[Mother]: Um, they were in my home, I—I don't exactly [remember] what month.

\* \* \*

"The Court: Approximately what month was that when you said no to him?

"[Mother]: Uh. Maybe April, May. I'm not quite sure."

[22] The following exchange took place:

"[Father's Counsel]: Your Honor, I would make an oral motion that the court consider if there's an agreement of the parties that if the hair test results are available before the court's decision is issued, that the court would perhaps consider receiving the results into evidence. And then that the court could then take that into consideration whether or not reasonable efforts toward rehabilitation would still be appropriate to continue.

"The Court: No. Absolutely not, [counsel].

"[Father's Counsel]: I object.

"The Court: The evidence has been closed in this case. The court will rule based on what it has heard up until about an hour and a half ago. [The mother] had years. Okay. Thank you."

The court denied that request, citing the mother's ability to submit such evidence earlier, if she so intended.

In its memorandum of decision, the court stated, inter alia, that the "[m]other's denial of marijuana use and her refusal to submit to hair testing is indicative of either two things: she is not sufficiently abstinent from use and understands the detrimental impact of a positive hair test or she is abstinent but fails to comprehend the positive import of a negative hair test. Either scenario supports an adjudication of failure to rehabilitate in that Janazia needs a caregiver who is unequivocally substance abuse free and who has the necessary insight as to why proof of sustained sobriety is so vital to Janazia's well-being."

"Whether or not a trial court will permit further evidence to be offered after the close of testimony in the case is a matter resting within its discretion. . . . In the ordinary situation where a trial court feels that, by inadvertence or mistake, there has been a failure to introduce available evidence upon a material issue in the case of such a nature that in its absence there is serious danger of a miscarriage of justice, it may properly permit that evidence to be introduced at any time before the case has been decided. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State v. Holmquist*, 173 Conn. 140, 152, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977); *Wasson v. Wasson*, 91 Conn. App. 149, 155–56, 881 A.2d 356, cert. denied, 276 Conn. 932, 890 A.2d 574 (2005).

"The trial judge's discretion, which is a legal discretion, should be exercised in conformity with the spirit

of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . Consistent with this responsibility, the trial court may not, in light of all the relevant factors, arbitrarily or unreasonably reject a motion to introduce additional evidence after the moving party has rested." (Citation omitted; internal quotation marks omitted.) *State* v. *Carter*, 228 Conn. 412, 421–22, 636 A.2d 821 (1994).

The mother argues that the court "sacrific[ed] certainty and [her] constitutional rights in the name of technical niceties of the adversarial process." Furthermore, she argues that "[e]ven if [she had] offer[ed] to take the [hair] test at the proverbial eleventh hour after the close of evidence but before the memorandum of decision is issued, considering the magnitude of the constitutional deprivation of liberty, and [her] offer of the test as crucial to the analysis of the degree of personal rehabilitation and sobriety, the results of [her] hair . . . test should be accepted into evidence and considered." We disagree.

The mother cites *Carter* as support for her argument that the court arbitrarily or unreasonably rejected the motion to introduce the results of a hair test. That case, however, is readily distinguishable. In *Carter*, our Supreme Court concluded that the trial court abused its discretion by refusing to permit the defendant to introduce additional evidence after the state's short rebuttal evidence and a recess. *State* v. *Carter*, supra, 228 Conn. 425. The defendant sought to introduce the alleged victim's criminal record, the accuracy of which was not contested, in support of his claim of self-defense. Id., 425–26. After the defendant rested his case, the state recalled one police officer for rebuttal testimony, and the court took a luncheon recess. Id., 418–19. Immediately after the recess, the defendant requested permission to introduce the victim's three criminal convictions. Id., 419. "The state objected to the defendant's

request to introduce the victim's convictions solely on the ground that the defendant's proffer was untimely, and the trial court denied the defendant's request for that reason, concluding that the defendant's request was simply 'too late.' " Id. Our Supreme Court held that, in light of the short delay in the defendant's offer, the undisputed accuracy of the evidence, the minimal delay of the trial proceedings and the critical nature of the evidence to the defendant's claim of self-defense, "[t]he trial court's exclusion of the evidence proffered by the defendant, solely because that evidence had been tendered just after, rather than just before, the brief luncheon recess, significantly impaired the defendant's ability to present his defense to the jury, and furthered no legitimate interest of the court or of the state." Id., 425–27.

In the present case, however, the court had abundant evidence of the mother's claimed sobriety and subsequent positive drug tests, her failure to attend previously scheduled hair test appointments, her failure to comply with multiple treatment programs and her tardiness or absence at scheduled visitations with Janazia. In addition, the court noted that the results of a hair test could only be damning for the mother; a positive result would show that she was still abusing marijuana, and, a negative result, in light of her past refusals, would indicate that she lacks the insight necessary to be a successful parent. We must also note that, because of the mother's past refusals, the court could not predict how many days, weeks or months it would take for the department to schedule a hair test, for the mother to attend (or fail to attend) and for the results to be submitted to the court in an appropriate manner. The delay might very well be substantial, and the court would continue to deny Janazia the permanency she so desperately needed. In addition, the results, as noted previously, would shed very little light on the mother's

rehabilitation. Accordingly, we conclude that the court appropriately exercised its discretion.

### III

Second, the mother claims that the court improperly found, by clear and convincing evidence, that she had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. Specifically, the mother claims that the court improperly found that (1) she denied having used marijuana, (2) she refused to submit to a hair test, (3) she did not comprehend the positive import of a negative hair test and (4) the health center "not only did not aid [her] in her personal rehabilitation, but created an impediment for her personal rehabilitation . . . ."[23]

### A

The mother challenges, as clearly erroneous, three factual findings surrounding her failure to submit to a hair test between June, 2006, and July, 2007. We find no error.

In its memorandum of decision, the court stated that the "[m]other claims she has been sober since December, 2006. Prior to May, 2007, [the health center] tested the mother on four or five occasions. . . . In December, 2006, [the mother] tested positive for marijuana. On multiple occasions, [the department] requested that the mother submit to hair tests. In June, again in July and again in August, 2006, the mother missed scheduled

---

[23] The mother makes two additional arguments: (1) that if she had been permitted to submit a hair test after closing arguments, the results would have compelled adjudicating her as rehabilitated; and (2) that this court should mandate that evidence of a hair test be accepted after the end of evidence in cases involving the termination of parental rights. In light of our discussion in part II, we find these claims without merit.

hair tests. In 2007, [the department] continued to request and the mother continued to refuse to submit a hair test. Although [the mother] was considering submitting to a hair test at the commencement of the [termination of parental rights] trial, at the conclusion of the . . . trial, no hair test had yet been performed." Later in the decision, the court stated that the "[m]other's denial of marijuana use and her refusal to submit to hair testing is indicative of either two things: she is not sufficiently abstinent from use and understands the detrimental impact of a positive hair test or she is abstinent but fails to comprehend the positive import of a negative hair test. Either scenario supports an adjudication of failure to rehabilitate in that Janazia needs a caregiver who is unequivocally substance abuse free and who has the necessary insight as to why proof of sustained sobriety is so vital to Janazia's well-being."

First, the mother challenges, as clearly erroneous, the court's finding that she denied using marijuana. The mother argues that she did not deny having used marijuana but that "[s]he admitted to it in open court, but went on to assert that she had been drug free since December, 2006." The mother, however, reads the court's statement out of context. It is clear that the court was referring to the mother's denial of marijuana use after December, 2006, as referenced earlier in its memorandum of decision. Thus, there is no error in the court's statement.

Second, the mother declares that "the court is incorrect that [she] refused to submit to a hair analysis before the end of evidence because she testified she would submit to a hair analysis." The mother argues that her testimony on July 23, 2007, showed that by the time of trial, she was willing to submit to a hair test. The mother insists that "[a]lthough [she] has, in the past, repeatedly declined to submit to a hair analysis . . . by the time

of trial she was unequivocally willing to submit to a hair test." The mother's position wilfully disregards that the court was referring to her consistent refusals over an entire year to submit to a hair test. The court's statement was not clearly erroneous.

Third, the mother argues that "contrary to the assertions of the court, [she] fully appreciated the consequences from a positive or negative hair analysis but did not appreciate the expectations of the court or the [department] as to the degree and level of sobriety required for the court to find she had attained adequate personal rehabilitation to avoid termination of her [parental] rights." As support for this argument, the mother cites only her testimony about the timing of various department requests that she submit to a hair test and her belief that it was her right to refuse the hair test.[24] The court, however, clearly weighed all of the evidence and drew a reasonable inference. We will not disturb a finding of fact that is supported by the record merely because there is some evidence that allows for an alternate inference. See *In re Shaun B.*, 97 Conn. App. 203, 209–10, 903 A.2d 246 (2006).

B

The mother also claims that the court improperly found that the health center's financial, personal, medical and psychological support of her was a detriment, and, in so finding, misconstrued the definition of "personal rehabilitation." We disagree.

After discussing the harm that Janazia already had suffered as a result of the frequent upheaval in her life, the court stated that it had "grave concerns about Janazia's ability to successfully navigate any potential removal from her present therapeutic foster home. An added concern for the court regarding the degree of

---

[24] See footnote 21.

the mother's rehabilitation is [her] level of dependence on the health center's young adult program and its staff. Clearly, the program is a vital and successful lifeline for [the mother], and the court has nothing but praise for [her] involvement with the program and for the excellent relationships that exist between [her] and her providers. Hopefully, for [her] sake, [her nurse's] belief that within one to two years [the mother] will be self-sustaining is accurate. However, in terms of Janazia's needs and best interests, the mother's own ongoing work toward independent living is not far enough along for reunification to be possible."

The mother correctly states that the requirement of "personal rehabilitation," as used in § 17a-112 (j) (3) (B) (i), allows a parent to include the use of support systems in his or her plan to be restored to his or her useful role as a parent. See *In re Eden F.*, 250 Conn. 674, 705–706, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999). She argues that the court disregarded that statutory definition and found that she had failed to achieve sufficient personal rehabilitation because of her ongoing reliance on the health center's services. The court, however, recognized that those services were important in and helpful to the mother's *ongoing* rehabilitation, but found that *despite the health center's extensive help*, the mother had not achieved sufficient personal rehabilitation to allow for her reunification with Janazia within a reasonable time. Accordingly, we find no error in the court's findings of fact.

IV

The mother next claims that the court improperly used a best interest standard when determining that she had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the

child, she could assume a responsible position in the life of the child.

"On appeal, we review a trial court's finding that a parent has failed to rehabilitate herself in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. . . . Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, supra, 250 Conn. 705–706.

"In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . . The trial court must also determine whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. . . . What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis. . . .

"Although the standard is not full rehabilitation, the parent must show more than *any* rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim that the parent has not achieved sufficient rehabilitation. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . . Thus, even if a parent has made successful strides in her ability to manage her life and may have achieved a level of stability within her limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, she could assume a responsible position in the life of her children." (Citations omitted; emphasis added; internal quotation marks omitted.) *In re Alejandro L.*, 91 Conn. App. 248, 259–60, 881 A.2d 450 (2005).

The mother claims that the court improperly considered the child's best interest as part of the basis for its finding that the mother had failed to achieve a sufficient degree of rehabilitation. Specifically, the mother argues that the court confused the analysis of personal rehabilitation with the dispositional phase by weighing her personal rehabilitation against the child's psychological, emotional and permanency needs.[25] The mother

---

[25] The mother also makes arguments that the petitioner failed to prove that the mother had failed to achieve sufficient rehabilitation as required by General Statutes § 17a-112 (j) (3) (B) (ii). We will not address those arguments. See footnote 11.

The mother again asserts that "there was no evidence that the [petitioner] proved that the mother had failed to [achieve] rehabilitat[ion] when she was willing to submit to a hair test, those test results were offered, and the court then rejected even considering the results." She insists that there was ample evidence reasonably to encourage a belief that within one or two years, the mother, with the health center's support, could assume a responsible position in Janazia's life. Because of our resolution of these claims in parts II and III, we will not consider them again.

cites only to the principle that "[n]o all-encompassing 'best interests' standard vitiates the requirement of compliance with the statutory criteria." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 672, 420 A.2d 875 (1979). The mother argues that the court engaged in a balancing test that disregarded compliance with the statutory criteria. We disagree.

The court engaged in an appropriate analysis of the mother's progress and the amount of time that she required to complete her rehabilitation. The court considered properly that in light of Janazia's emotional problems and need for permanency, the "mother's ongoing work toward independent living is not far enough along for reunification to be possible." The mother correctly asserts that it would be improper for a court to consider the child's best interests in disregard of the statutory criteria; however, § 17a-112 (j) (3) (B) (i) specifically requires that the court consider whether there is clear and convincing evidence that a parent "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, *considering the age and needs of the child,* such parent could assume a responsible position in the life of the child . . . ." (Emphasis added.) General Statutes § 17a-112 (j) (3) (B) (i). We therefore conclude that the court appropriately performed its analysis in accordance with the statutory criteria.

V

Both respondent parents claim that the court improperly found that it was in the best interest of Janazia to terminate their parental rights. The father argues that termination was not warranted because (1) given the mother's progress, an intensive reunification program would allow for Janazia's placement with the mother and would not require termination of his parental rights and (2) failing reunification with the mother, Janazia

could have the consistency of foster care and maintain a relationship with her biological parents. The mother argues that the disposition terminating parental rights was improper because the court gave little to no weight to her efforts toward personal rehabilitation.[26]

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child." (Internal quotation marks omitted.) *In re Davonta V.*, 98 Conn. App. 42, 46, 907 A.2d 126 (2006), aff'd, 285 Conn. 483, 940 A.2d 733 (2008). "It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the children only if the court's findings are clearly erroneous." *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the

---

[26] The mother also claims that the court improperly found that termination was in Janazia's best interest because the department did not make reasonable efforts, pursuant to General Statutes § 17a-112 (k) (2) to reunite Janazia with her extended biological family, specifically Janazia's maternal step-grandfather or maternal great aunt. Section 17a-112 (k) provides in relevant part: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding . . . (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended . . . ." General Statutes § 17a-112 (k).

The mother does not cite any authority for her apparent argument that § 17a-112 (k) (2) requires the department to make reasonable efforts to reunite a child with any available member of his or her extended biological family. Additionally, the mother does not present any argument in support for her novel interpretation. We see no reason, under these circumstances, to interpret the statute in this manner.

child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]." (Internal quotation marks omitted.) *In re Joseph L.*, 105 Conn. App. 515, 529, 939 A.2d 16, cert. denied, 287 Conn. 902, 947 A.2d 341, 342 (2008). "The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Citation omitted.) *In re Victoria B.*, 79 Conn. App. 245, 261, 829 A.2d 855 (2003).

First, the father argues that termination of his parental rights was unnecessary because placement with the mother was possible. The father argues that "[t]here is a loving and appropriate parent-child relationship in this case between [Janazia] and the . . . mother. In this case, where the . . . mother has made progress in addressing her issues, and has consistently provided love and affection to her child, it cannot be said that the decision to terminate parental rights is in the child's best interests." The court, however, found that termination of the mother's parental rights was in Janazia's best interest because of the mother's lack of sufficient personal rehabilitation. The court weighed all of the evidence and found that although the mother had achieved some progress and may continue to improve, "[t]oo much time has elapsed, and Janazia has suffered from too much uncertainty and instability in her young life. She needs permanency as quickly as possible. It is in the child's best interest to be adopted by her present therapeutic foster family." In light of the record before us, we cannot say that the court's finding was clearly erroneous.

In support of his second argument, the father cites many cases in which the courts recognized that in some circumstances, despite parents' inability to care for

their children, parental rights need not be terminated because the effect of continuing parental rights is not detrimental to the child. See, e.g., *In re Migdalia M.*, 6 Conn. App. 194, 207–208, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). We agree that the concept of family often encompasses more than the traditional notion of one father and one mother; in this case, however, the court expressly found that Janazia's best interest was served by terminating the respondents' rights and allowing her to find a permanent adoptive home. In support of that finding, the court noted that much of her life had been spent in the custody of the petitioner and that she desperately needed stability and permanency in her life. Accordingly, we find the father's argument without merit.

The mother argues that the court afforded little or no weight to her efforts to change her circumstances, conduct and conditions for the better. "Our function as an appellate court is to review and not retry the proceeding of the trial court. . . . The probative force of conflicting evidence is for the trier to determine. . . . We defer to the trier of fact's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. The trier is the judge of the credibility of all the witnesses and the weight to be given their testimony, and may accept part, all or none of the testimony. . . . Where . . . the record reveals that the trial court's ultimate conclusions are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding." (Citation omitted; internal quotation marks omitted.) *In re Victoria B.*, supra, 79 Conn. App. 262–63.

The court found by clear and convincing evidence that Janazia's best interest would be best served by terminating the respondents' parental rights. Its

thoughtful decision noted the abundant evidence of the respondent parents' ongoing struggles with criminal behavior and addiction, Janazia's resulting emotional problems and the need for permanency in the child's life. Accordingly, we conclude that the court's findings and conclusions are not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.