******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# IN RE AUBREY K.*
## (AC 45241)

Bright, C. J., and Seeley and Pellegrino, Js.

*Syllabus*

The respondent mother appealed to this court from the judgment of the trial court terminating her parental rights with respect to her minor child, A. The mother had a history of substance abuse, mental health issues, and domestic violence in her relationships, and A had witnessed such violence since her infancy. One of the mother's boyfriends seriously injured A's younger sister, requiring her to be hospitalized and, thereafter, the petitioner, the Commissioner of Children and Families, filed petitions for termination of the mother's parental rights as to both children. At the time of trial, the mother was allegedly engaged to a different man, L. On appeal, the mother claimed that there was insufficient evidence for the trial court to find that the termination of her parental rights was in A's best interest, in accordance with the applicable statute (§ 17a-112 (k)). *Held:*

1. The respondent mother could not prevail on her claim that the trial court's findings as to her ability to care for A were clearly erroneous:

   a. The trial court's conclusions regarding the mother's relationship with L and its indication of her ability to be trusted with the health and well-being of young children were supported by the record, including ample evidence demonstrating that the mother's past romantic relationships had significant adverse residual effects on A, evidence of L's previous criminal history, the mother's failure to disclose domestic violence in her relationships to the Department of Children and Families (department) in the past, evidence that supported the department's concern that there was a risk of domestic violence in the mother's relationship with L despite the testimony of service providers, and testimony that the mother would not permit an in-person meeting between the department and L.

   b. This court concluded that, although it agreed with the respondent mother's claim that the trial court had understated her efforts at rehabilitation, there was evidence in the record to support the trial court's finding that the mother was unable and/or unwilling to benefit from the services offered by the department and the record demonstrated that other factors considered by the trial court with respect to whether termination of the mother's parental rights was in A's best interest outweighed the continuing efforts made by the mother to advance her rehabilitation.

2. The respondent mother could not prevail on her claim that the trial court's best interest determination was clearly erroneous as the unchallenged factual findings regarding A's therapeutic needs, the department's concern for A's potential regression if she were returned to the mother's care, and the need for A to have stability in her life supported the court's determination.

3. Contrary to the respondent mother's claim, this court was not left with a definite and firm conviction that a mistake had been made by the trial court in its best interest determination as the facts in the record strongly supported that determination: the court addressed each of the seven factors delineated by § 17a-112 (k) and this court would not second-guess that court's assessment that A's need for permanency, stability and continuity of environment outweighed the benefits of maintaining a connection with the mother; in the present case, the court found that A required extensive and ongoing therapeutic and clinical services to treat her mental health issues, the frequency and severity of her behavioral issues had reduced in her most recent foster home because of the consistent and in-depth therapeutic services she engaged in with the facilitation of her foster parents, A had bonded with her most recent foster family, and A's foster parents were willing to adopt both A and her younger sister.

Argued September 6—officially released November 21, 2022**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New Britain, Juvenile Matters, where the respondent father consented to the termination of his parental rights; thereafter, the matter was tried to the court, *C. Taylor, J.*; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Joshua Michtom*, assistant public defender, for the appellant (respondent mother).

*Nisa J. Khan*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark*, assistant attorney general, for the appellee (petitioner).

*Opinion*

BRIGHT, C. J. The respondent mother, Victoria K., appeals from the judgment of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights with respect to her minor daughter, Aubrey K. (Aubrey),[1] on the ground that the respondent's acts of parental commission or omission denied Aubrey the care necessary for her well-being pursuant to General Statutes § 17a-112 (j) (3) (C).[2] The court also found that, although the Department of Children and Families (department) had made reasonable efforts to reunify the respondent with Aubrey, the respondent was unable or unwilling to benefit from reunification efforts; see General Statutes § 17a-112 (j) (1); and that termination of the respondent's parental rights was in Aubrey's best interest. See General Statutes § 17a-112 (j) (2). On appeal, the respondent's single claim is that there was insufficient evidence for the trial court to find that the termination of her parental rights was in Aubrey's best interest. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the resolution of this appeal. Aubrey was born in October, 2014, to the respondent and Jacob K. (Jacob) and is the respondent's eldest child. Jacob abused the respondent during their relationship, and Aubrey was present as an infant during incidents of the abuse. In 2015, Jacob was arrested and charged with various offenses stemming from his physical abuse of the respondent, and the criminal court issued a protective order against Jacob protecting the respondent from May 26, 2015, through November 15, 2016. In December, 2017, the respondent had a second child, Amelia K. (Amelia), with Gregory S. (Gregory).[3]

In January, 2019, the respondent met and began a romantic relationship with Dylan V. (Dylan) while both were staying at a shelter in New Britain. In February, 2019, Dylan, the respondent, Aubrey, and Amelia moved into an apartment together. Dylan began physically abusing the respondent shortly thereafter and continued to do so on a regular basis while he lived with the respondent. While she and her children lived with Dylan, the respondent left Aubrey and Amelia alone in Dylan's care while she went to work Monday through Friday afternoons and when she had appointments in the mornings. During this time, Aubrey was assaulted by Dylan at least once in the respondent's presence.

On June 22, 2019, the department received a report from the Hospital of Central Connecticut (hospital) regarding Amelia through its Child Abuse and Neglect Careline (careline). After an initial evaluation at the hospital, Amelia was transferred to Connecticut Children's Medical Center (medical center) due to physical injuries. She had sustained multiple rib fractures, two

healing hand fractures of the right hand, a laceration to the pancreas, significant bruising to her body, and bruising around her anus. Amelia had also lost two pounds in one week, vomited several times, had a low-grade fever for two weeks, and appeared "wobbly and weak." Her blood work did not show any underlying medical conditions that may have caused the injuries. Amelia's injuries were suspicious for inflicted injury and the matter was referred to the medical center's Suspected Child Abuse and Neglect (SCAN) team for further investigation.

In the early hours of June 23, 2019, the department faxed a suspected abuse and neglect report to the New Britain Police Department. The department also assigned the case to a careline primary investigator, who worked with the SCAN team to investigate the matter. Due to the suspicious nature of Amelia's injuries, the department investigator and the SCAN team had Aubrey examined for similar injuries. Aubrey did not present with any bruising or physical injuries. At that time, both the respondent and Dylan maintained that they did not know how Amelia had been injured.

At 1:50 p.m., the department investigator and a medical center trauma team member spoke with the respondent individually and informed her of the full extent of Amelia's injuries. Upon hearing this, the respondent became extremely upset and stated that only she and Dylan care for the children, and because she did not injure Amelia, Dylan must have done so. The department thereafter implemented a ninety-six hour administrative hold on behalf of both Aubrey and Amelia.

Police officers then brought the respondent and Dylan to the New Britain Police Department and interviewed them separately. The respondent reported that she first noticed bruises on Amelia two weeks prior to June 22, 2019, and that the bruises continued to grow. On June 22, 2019, upon seeing that Amelia could not walk, the respondent brought Amelia to the hospital. She had not sought medical attention for Amelia in relation to the bruising prior to that point.

During his interview with the police, Dylan admitted to causing Amelia's injuries. About two weeks prior to June 22, 2019, Amelia became fussy and would not go back to bed. Amelia had been constipated, so Dylan put her on the kitchen counter and began pushing on her stomach with his fists. Dylan became frustrated and proceeded to push on her stomach as hard as he could. He also said that he became angry and "snapped" and might have punched Amelia in the stomach. Dylan then placed Amelia in her crib. When Amelia continued to cry, Dylan went into her room and grabbed two of her fingers and bent them backward. Dylan did not tell the respondent about his actions. On June 24, 2019, Dylan was arrested and charged with cruelty to persons, risk of injury to a child, and assault in the first degree.

On June 24, 2019, department investigators and SCAN team members met with the respondent to gather social history information regarding Amelia and further interview her about the events leading to Amelia's injuries. The respondent disclosed previous incidents of domestic violence by Dylan and indicated that she was fearful of him. Although she had wanted to bring Amelia for medical care earlier than June 22, Dylan had told her not to and she had been afraid Dylan would hurt her if she did not do what he said.

On June 27, 2019, the respondent was arrested and charged with risk of injury to a child and cruelty to persons for her failure to seek medical attention for Amelia in a timely manner. Subsequently, the respondent pleaded nolo contendere and was thereafter convicted of one count of risk of injury to a child.[4] She was sentenced to five years of incarceration, execution suspended, with three years of probation. The sentencing court also issued a no contact standing criminal protective order prohibiting the respondent from having any contact with Amelia until January 7, 2099.

On June 27, 2019, the petitioner sought an order of temporary custody on behalf of both Aubrey and Amelia. She alleged that the children were in physical danger and that immediate removal was necessary to ensure their safety. That day, the petitioner also filed neglect petitions and termination of parental rights petitions as to both children.

In the neglect petitions, the petitioner alleged that the children had been denied proper care and attention, physically, educationally, emotionally, or morally, and that the children had been permitted to live under conditions, circumstances, or associations injurious to their well-being. Additionally, the petitioner alleged that Amelia had been abused in that she (1) had physical injury or injuries inflicted by other than accidental means, (2) had injuries that were at variance with the history given of them, or (3) was in a condition that resulted from maltreatment, including but not limited to malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment, or cruel punishment.

In the termination of parental rights petition for Aubrey, the petitioner alleged claims of abandonment and no ongoing relationship as to her father, Jacob, and acts of commission/omission as to the respondent. Regarding Amelia, the petitioner alleged claims of abandonment and no ongoing relationship as to her father, Gregory, and acts of commission/omission and assault of a sibling as to the respondent.

On June 27, 2019, the court, *Aaron, J.*, granted an ex parte order of temporary custody and ordered specific steps for the respondent. On July 2, 2019, the respondent appeared in court with counsel. She did not chal-

lenge the order for temporary custody and entered a pro forma denial as to the neglect allegations. The court, *Abery-Wetstone, J.*, issued amended preliminary steps for the respondent.

On October 28, 2019, the department began facilitating weekly supervised visits between Aubrey and the respondent. Those visitations continued through trial of the termination petition.

On January 27, 2020, the respondent entered written pleas of nolo contendere to the conditions injurious section of the neglect petitions concerning Amelia and Aubrey. The respondent also entered written pleas of nolo contendere to the abuse section concerning Amelia relating to physical injury or injuries inflicted by nonaccidental means and to a condition that is the result of maltreatment. The court, *Huddleston, J.*, accepted the respondent's pleas, adjudicated both children neglected, and committed the children to the care and custody of the petitioner. The court also ordered final steps for the respondent.[5] In accordance with those steps and the department's reunification efforts, the respondent was referred to several service providers.

In or around March, 2020, the department was made aware that the respondent had begun a romantic relationship with Luis C. (Luis), whom she met four months earlier while both were residing in a shelter. When the respondent found housing, she invited Luis to move in with her. Luis had been convicted of disorderly conduct, did not have steady employment, and was "the subject of several expired full no contact protective orders with a former girlfriend (December, 2015, to June, 2016) and family members (July, 2017, to November, 2019) identified as protected parties." Consequently, the department was concerned that reuniting Aubrey with the respondent would place her in an environment where she could again be exposed to domestic violence.

In July, 2020, the petitioner filed a motion to review the children's permanency plans. The permanency plan for each child called for the termination of the respondent's parental rights and the rights of each child's father and subsequent adoption of Aubrey and Amelia. On October 7, 2020, the court, *C. Taylor, J.*, granted the motion, approving the plans.

A trial on the petitions to terminate parental rights occurred on March 8 and 15, June 14, and July 20, 21 and 22, 2021. The respondent appeared and was represented by counsel. On the second day of trial, Aubrey's father, Jacob, consented to the termination of his parental rights.

On November 17, 2021, the court, *C. Taylor, J.*, issued a memorandum of decision in which it granted the petitions to terminate the respondent's parental rights as to both Aubrey and Amelia.[6] The court made extensive findings of fact and concluded that the petitioner

had established by clear and convincing evidence that statutory grounds for termination of parental rights existed and that such termination was in the best interests of the children.

With respect to the statutory grounds, the court found by clear and convincing evidence that Aubrey and Amelia had been denied, by reason of an act or acts of parental commission or omission, including but not limited to severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being. In particular, the court determined that the respondent's failure to remove Amelia and Aubrey from Dylan's presence, to obtain prompt medical care for Amelia, and to object or to act when Dylan assaulted Aubrey in her presence showed that her priorities were not those consistent with the best interests of her children and demonstrated that she could not be relied on to care for them adequately and safely. The court also found, pursuant to § 17a-112 (j) (1), that the department had made reasonable efforts to reunify the respondent with Aubrey and Amelia and that the respondent was unable or unwilling to benefit from those efforts.

Finally, in the dispositional phase of the proceedings, the court considered and made the requisite factual findings pursuant to § 17a-112 (k)[7] and concluded that the petitioner had proved by clear and convincing evidence that terminating the respondent's parental rights was in Aubrey's and Amelia's best interests. Specifically, the court made the following relevant findings:

"Considered carefully, the clear and convincing evidence shows that [the department] offered timely, appropriate, and comprehensive services to [the respondent] to facilitate her reunification with Aubrey and made reasonable efforts to reunite her with Aubrey. . . . The clear and convincing evidence indicates that [the respondent] did utilize some services as indicated herein but failed to gain appropriate benefits from these services. . . .

"The court further finds that the clear and convincing evidence presented in the present case indicates that [the respondent] was aware of her issues and deficits and had received specific steps addressing said issues. The clear and convincing evidence shows that despite having knowledge of the nature of [her] individual issues, [the respondent] remained unable and/or unwilling to benefit from reasonable reunification services with Aubrey. . . .[8]

"The clear and convincing evidence shows that [the respondent] has generally complied with the final specific steps, and that she was still in treatment at [Community Mental Health Affiliates (CMHA)] at the time of the . . . trial. However, [the respondent] does not appear to have undertaken an intensive domestic vio-

lence program yet. . . ."[9]

"The court finds by clear and convincing evidence that [the respondent] has been unable and/or unwilling to make realistic and sustained efforts to conform her conduct to acceptable parental standards. The clear and convincing evidence indicates that [the respondent] has been unable and/or unwilling to address her issues, especially her mental health issues, substance abuse issues, domestic violence issues, parenting deficits, and failure to fully benefit from counseling and services in a timely manner. The clear and convincing evidence also shows that [the respondent] has been placed on notice to address her issues in the past. Despite being offered opportunities to address her issues, [the respondent] has failed to do so with any degree of finality.

"The clear and convincing evidence indicates that [the respondent] is still in individual therapy and has yet to appropriately address her troubling domestic violence issues. [The respondent's] domestic violence issues are extremely concerning. Those issues have resulted in the present situation that she finds herself in, and her relationships with men have been beset with domestic violence issues, which has resulted in serious physical injury to Amelia. . . . [The respondent's] rashness in establishing a hasty relationship with Luis . . . demonstrates her questionable judgment.

"The clear and convincing evidence shows that despite the best efforts by [the department], [the respondent] is unable and/or unwilling to take the steps necessary in order to attempt to become a safe, nurturing and responsible parent for Amelia and Aubrey. The evidence at the . . . trial clearly and convincingly shows that she is incapable of being a safe, nurturing and responsible parent for her children. [The respondent] is obviously unable to care for Amelia and Aubrey appropriately and to provide them with the safety, care, permanence, and stability that each child needs and deserves. Her obvious parental deficits and other issues make her incapable of being a safe, responsible and nurturing mother for Amelia and Aubrey.

"The court finds by clear and convincing evidence that [the respondent] has not made the changes necessary in her individual lifestyle in a timely manner that would indicate that she would be a safe, responsible and nurturing parent for Amelia and Aubrey.

"The court finds by clear and convincing evidence that to allow [the respondent] further time to rehabilitate herself, if that were possible, and to assume a responsible position in the children's lives would not be in the best interests of Amelia and Aubrey." (Citations omitted.)

The court then explained that it had "examined multiple relevant factors, including the children's interests in sustained growth, development, well-being, stability,

and continuity of their environment; their length of stay in foster care; the nature of their relationships with their foster parents and their biological parents; and the degree of contact maintained with their biological parents," to determine whether termination of parental rights would be in the best interests of the children.

The court noted that it had "to balance the children's intrinsic needs for stability and permanency against the benefits of maintaining a connection with their biological parents." The court determined that, "under such scrutiny, the clear and convincing evidence in the present matter establishes that it is not in the best interests of Amelia and Aubrey to continue to maintain any legal relationship with the respondent parents.

"The clear and convincing evidence shows that Jacob, [the respondent] and Gregory have numerous issues that are clearly antithetical to safe, responsible, and nurturing parenting, and are also antagonistic to the best interests of Amelia and Aubrey. . . .

"The clear and convincing evidence shows that [the respondent's] issues are those of substance abuse, mental health, parenting deficits, domestic violence and a failure to complete and benefit from counseling and services. The clear and convincing evidence also shows that [the respondent] was unable to appropriately address these issues by the time of the filing of the . . . petition or by the time of the . . . trial.

"[The respondent] has undertaken some treatment. Alison Cormier, [a licensed clinical social worker], [the respondent's] clinician at the jail diversion program at CMHA, testified that [the respondent] had successfully completed that program. Cormier characterized [the respondent] as having gone from high risk to a lesser level. Cormier also indicated that one of the objectives of the program was that [the respondent] work on developing healthy relationships. Cormier opined that [the respondent] was no longer at high risk for substance abuse and domestic violence and that she had gained insight into her predicament.

"Kimberly Sullivan, [a licensed clinical social worker], testified as to [the respondent's] successful completion of the [intensive outpatient program] at CMHA, and stated that [the respondent] was an active participant and had made progress toward the [treatment] goals. Sullivan testified that domestic violence was not one of [the respondent's] treatment goals.

"The most telling aspect as to [the respondent's] mindset lies in her most outstanding issue. [The respondent's] downfall has always been her choice of male companionship. [The respondent's] men have been violent, involved in the criminal justice system and have domestic violence involvement.

"Jacob is a violent convicted felon, and he has a lifetime no contact protective order with the mother of

his older child. He has a history of serious dysfunction, which dates back to his childhood. Jacob has a history of delinquency, [families with service needs][10] behavior and mental health issues. Yet, [the respondent] believed that Jacob was an appropriate individual to have a relationship with and to father her child, despite his concerning issues.

"Gregory is a violent convicted felon, and he is presently finishing a five year jail term for violation of a [protective] order and assault in the second degree. He has numerous other felony and misdemeanor convictions, including additional convictions for violation of a [protective] order, assault in the second degree and sale of narcotics. . . . Again, [the respondent] believed that Gregory, like Jacob, was an appropriate individual to have a relationship with and to father her child, despite his concerning issues.

"The court next addresses Dylan, who [the respondent] had met in a homeless shelter and established a relationship with. In February, 2019, through the auspices of [the Supportive Housing for Families program], [the respondent] secured housing for herself and her children, but then invited Dylan to reside with them. [The respondent] was aware that Dylan was residing at the shelter after his discharge from a hospital as a result of a [suicide] attempt. She also knew that he was not allowed to go back to his family's home after a fight with his brother. Nevertheless, she invited Dylan to reside with her and her young, dependent children. The results of that dangerous exercise of extremely poor judgment left Amelia seriously injured and Aubrey further traumatized.

"[The respondent] has again exercised extremely poor judgment in returning to the homeless shelter and establishing a relationship with Luis . . . one of the fellow denizens therein. She established that relationship in an extremely short period of time. Like [the respondent did with] Dylan, when she found housing, she invited Luis . . . to move in with her. Not much is known about [Luis'] history. He has a conviction for disorderly conduct and has been the alleged perpetrator in various protective orders. He does not have any steady employment. [The respondent] has done her best to prevent [the department] from getting any further information about [Luis]. [The respondent] now refers to Luis . . . as her fiancé.

"It is clear that [the respondent's] need to have a relationship with a man overpowers any maternal protective instinct and any individual protective instinct that she may have possessed. That need appears to defy all logic and common sense, and places her children and herself in dire peril, as demonstrated by her relationship with Dylan. Despite the fact that Dylan beat her, beat Aubrey, and left Amelia with a mass of bruises, [the respondent] could not force herself to leave Dylan to

save herself and her children.

"[The respondent] has proven that she cannot be trusted with the health and well-being of young children. She cannot prioritize their health, safety and well-being over the man in her life, regardless of how callous his hands might be. Perhaps an accurate assessment of [the respondent] and her situation has already been made by Jacob, who had reported to [the department] 'that [the respondent] has the tendency to neglect her children when she is involved in intimate relationships due to her low self-esteem and mental instability.'

"Unfortunately, the clear and convincing evidence shows that, despite her referrals and services, [the respondent] has failed to rehabilitate herself sufficiently to be a safe, nurturing, and responsible parent for both Amelia and Aubrey. The court also finds that too much time has already elapsed to justify giving [the respondent] further time to show her rehabilitation.

"The clear and convincing evidence shows that . . . [the respondent] . . . cannot keep [her] children safe or care for them properly. The clear and convincing evidence also shows that . . . [the respondent has] failed to gain insight into the efforts that [she] needs to make in order to become a safe, nurturing, and responsible parent for [her] children. The clear and convincing evidence shows that the individual judgment and conduct of [the respondent] still remains questionable.

"The clear and convincing evidence shows that Amelia and Aubrey cannot afford to wait any longer for [the respondent] to rehabilitate [herself]. [The respondent] represent[s] a well demonstrated hazard and a danger to them.

"The clear and convincing evidence shows that the time that the respondent . . . need[s] to attempt to rehabilitate [herself] and establish [herself] in the community as [a] safe, nurturing, and responsible [parent], if that were possible, is time that the children cannot spare.

"The individual parental performance . . . of [the respondent] clearly and convincingly show[s] that [she] lacks the attributes and characteristics necessary to fulfill a valid parental role. [Her] individual [failure] to address [her] issues in a timely manner and to successfully address [her] individual parental deficits clearly and convincingly show that it is unlikely that [she] will ever be able to conform [her] individual behaviors to appropriate parental standards or be able to serve as a safe, nurturing, and responsible [parent] for Amelia or Aubrey.

"Based upon the individual behaviors and performances so far of . . . [the respondent] . . . this court cannot foresee . . . the respondent . . . ever having the ability or the patience required to follow the regimen

necessary for . . . her children to maximize their abilities and achievements.

"[The department] recommended the [termination of parental rights]. . . . [The department] also noted that [the respondent] was aware of Dylan's abusive behavior and psychological issues but still asked him to move into her home with her children. [The department] argued that [the respondent] had not yet adequately dealt with her domestic violence issues.

"[The respondent] has barely begun unearthing her domestic violence and mental health issues. Her previous clinician, [Antonia] Mahoney, reported that domestic violence was addressed in individual sessions, but that [the respondent] has only 'briefly' discussed her current relationship with Luis . . . . On January 28, 2021, [Raven] Williams, another clinician, reported that [the respondent] accepts responsibility for 'not knowing' what Dylan was doing to her children. Williams reported that a domestic violence component has not been added to [the respondent's] treatment at this time. [The department] indicated concern with [the respondent's] conduct concerning Luis. . . .

"There has been absolutely no evidence to establish the unreasonableness of this request.

"At the . . . trial, counsel for the children recommended the [termination of parental rights] as being in the best interests of Amelia and Aubrey. . . .

"Counsel for [the respondent] argued against the [termination of parental rights], pointing out that Dylan had abused and controlled [the respondent] and that [the respondent's] low self-esteem and history of childhood abuse made her susceptible. Counsel for [the respondent] conceded that her client could not effectively contest the [termination of parental rights] for Amelia due to the criminal disposition and the standing criminal protective order. She also claimed that [the department] was shortsighted in not acknowledging any damage caused to Aubrey by the change in foster homes.

"Counsel for [the respondent] pointed out that [the respondent] had done services, gotten a job and was involved in a new relationship. She claimed that [the respondent] has gained insight into how she failed her children. Counsel for [the respondent] claimed that her client was a changed woman, was capable of parenting Aubrey and should be given a chance to do so. . . .

"The clear and convincing evidence shows that the respondent [is] in no position to assume [her] children's care in a safe, nurturing and responsible manner.

"[The respondent] has undertaken services and has visited with Aubrey. [The respondent] also has a residence and full-time employment. Unfortunately, [the respondent] has yet to appropriately address her

domestic violence issues, and has prioritized her relationship with Luis . . . over her children. . . .

"The clear and convincing evidence shows that Amelia and Aubrey can no longer wait for permanency, continuity, and stability in their lives. The children need a chance to grow up in a stable home with responsible, nurturing and trustworthy caretakers who have their best interests as paramount. The present foster parents have indicated a willingness to adopt the children. Amelia and Aubrey . . . have an opportunity for stability, nurture and permanence in the foster home." (Footnotes omitted.)

The court concluded that, having balanced the individual and intrinsic needs of Amelia and Aubrey for stability and permanency against the benefits of maintaining a connection with the respondent, the clear and convincing evidence established that the best interests of Amelia and Aubrey could not be served by continuing to maintain any legal relationship to the respondent. The court therefore granted the petitions to terminate the respondent's parental rights as to Amelia and Aubrey. This appeal as to Aubrey followed. Additional facts will be set forth as necessary.

On appeal, the respondent does not contest the court's findings in the adjudicatory phase of the proceeding, namely, that the respondent's acts of parental commission or omission denied Aubrey the care necessary for her well-being and that the department made reasonable efforts to reunify Aubrey with the respondent. The respondent concedes that these findings are supported by clear and convincing evidence. Instead, the respondent challenges the court's finding in the dispositional phase of the proceeding that it was in the best interest of Aubrey to terminate the respondent's parental rights. Specifically, the respondent contends that there was insufficient evidence for the court to find that the termination of her parental rights was in Aubrey's best interest. We disagree.

We begin with our standard of review. Our Supreme Court has clarified that a trial court's ultimate conclusion that a ground for termination of parental rights has been proven presents a question of evidentiary sufficiency. See *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015) (clarifying standard of review); see also *In re Egypt E.*, 327 Conn. 506, 525–26, 175 A.3d 21 ("[a]lthough the trial court's subordinate factual findings are reviewable only for clear error, the court's ultimate conclusion that a ground for termination of parental rights has been proven presents a question of evidentiary sufficiency"), cert. denied sub nom. *Morsy E.* v. *Commissioner, Dept. of Children & Families*, U.S. , 139 S. Ct. 88, 202 L. Ed. 2d 27 (2018).

Since *In re Shane M.*, our Supreme Court has not had the occasion to address whether the evidentiary

sufficiency standard of review applies to a court's best interest determination. As a result, this court has either declined to decide whether to apply the evidentiary sufficiency standard of review to a best interest claim; see, e.g., *In re Elijah G.-R.*, 167 Conn. App. 1, 29–30 n.11, 142 A.3d 482 (2016); *In re Nioshka A. N.*, 161 Conn. App. 627, 637 n.9, 128 A.3d 619, cert. denied, 320 Conn. 912, 128 A.3d 955 (2015); or has continued to apply the clearly erroneous standard of review. See, e.g., *In re Angelina M.*, 187 Conn. App. 801, 803–804, 203 A.3d 698 (2019); *In re Gabriella C.-G.*, 186 Conn. App. 767, 770, 200 A.3d 1201 (2018), cert. denied, 330 Conn. 969, 200 A.3d 699 (2019); *In re Athena C.*, 181 Conn. App. 803, 811, 186 A.3d 1198 (2018). Following our precedents, we apply the clearly erroneous standard of review to the respondent's claim.[11]

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [respondent's] parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven statutory factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence. . . .

"[T]he fact that the legislature [has interpolated] objective guidelines into the open-ended fact-oriented statutes which govern [parental termination] disputes . . . should not be construed as a predetermined weighing of evidence . . . by the legislature. [If] . . . the record reveals that the trial court's ultimate conclusions [regarding termination of parental rights] are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding . . . . Indeed . . . [t]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . [A] trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound." (Internal quotation marks omitted.) *In re Ryder M.*, 211 Conn. App. 793, 817–18, 274 A.3d 218, cert. denied, 343 Conn. 931,

276 A.3d 433 (2022); see also *In re Malachi E.*, 188 Conn. App. 426, 443–45, 204 A.3d 810 (2019); *In re Jacob M.*, 204 Conn. App. 763, 787–89, 255 A.3d 918, cert. denied, 337 Conn. 909, 253 A.3d 43 (2021), and cert. denied sub nom. *In re Natasha T.*, 337 Conn. 909, 253 A.3d 44 (2021).

"A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 488, 940 A.2d 733 (2008).

In the present case, the court addressed each of the factors set forth in § 17a-112 (k) before determining that terminating the respondent's parental rights was in the best interest of Aubrey. On appeal, the respondent challenges the court's subordinate factual findings. The respondent contends that (1) the court's findings as to her efforts to improve her ability to care for Aubrey are clearly erroneous, (2) the court's findings as to Aubrey's need for permanency ignore the evidence presented, and (3) "the facts of this case are unusual and should leave this court with the definite and firm conviction that a mistake has been made." We address each contention in turn.

I

The respondent contends that the court's findings as to her ability to care for Aubrey are clearly erroneous.[12] We disagree.

A

First, the respondent advances several related arguments that, when read together, dispute the court's finding that "[the respondent] has again exercised extremely poor judgment in returning to the homeless shelter and establishing a relationship with Luis . . . one of the fellow denizens therein. . . . It is clear that [the respondent's] need to have a relationship with a man overpowers any maternal protective instinct and any individual protective instinct that she may have possessed. . . . [The respondent] has proven that she cannot be trusted with the health and well-being of young children. She cannot prioritize their health, safety and well-being over the man in her life, regardless of how callous his hands might be." The gravamen of the respondent's arguments is that the court drew conclusions about the respondent's relationship with Luis that were unsupported by the evidence. Specifically, the respondent argues: (1) the court improperly considered her former romantic partners, their involvement with the criminal justice system, and their histories of violence in evaluating her current relationship with Luis; (2) the court failed to cite any authority for the premise that romantic relationships with homeless people are presumptively ill-considered or that there is a timeline

for relationships that is presumptively imprudent; (3) the court did not point to evidence in the record indicating problematic aspects of her relationship with Luis; and (4) "there is no evidence in the record of violence, coercion, or red flags of any kind in this relationship." For the reasons that follow, we find the respondent's arguments unpersuasive.

At the outset, we note that there is ample evidence in the record demonstrating that the respondent's past romantic relationships had significant adverse residual effects on Aubrey. In December, 2019, when the respondent was released from prison, Aubrey talked about killing herself out of fear that Dylan was also being released and would be able to hurt Aubrey and the respondent. At the time of trial, Aubrey continued to demonstrate anxiety about her mother's relationships, asking the respondent if Luis was nice to her or yelled at her. Sasha Baldwin, the respondent's department case worker, testified that she believed Aubrey's questions demonstrated a concern for the respondent's safety in a new relationship. Although the respondent argues that the court's consideration of her past relationships was improper, we conclude that the court properly considered the respondent's past relationships in evaluating how the respondent's present circumstances would affect Aubrey, including Aubrey's concerns about the respondent's new relationship because of what Aubrey witnessed in the respondent's past relationships.

Further, the court's findings as to the respondent's relationship with Luis are supported by evidence in the record. The respondent began an intimate relationship with Luis in March, 2020, approximately nine months after Amelia had been hospitalized due to injuries inflicted on her by Dylan and shortly after the respondent had resolved her own criminal case relating to those injuries. Though not referenced by the court in its decision, Baldwin testified that "there were concerns regarding [the respondent] involving herself in an intimate relationship . . . and . . . the choice of the individual who she chose to involve herself with and how that may impact her children." Baldwin also testified that the department was concerned that, should Aubrey be returned to the respondent's care, she would be placed in a situation to witness domestic violence in the respondent's relationship with Luis that was similar to what she had witnessed in the respondent's relationship with Dylan. There was also evidence in the record that Luis had been convicted of disorderly conduct, did not have steady employment, and was "the subject of several expired full no contact protective orders with a former girlfriend (December, 2015, to June, 2016) and family members (July, 2017, to November, 2019) identified as protected parties." Although the details of the protective orders and the conviction were not introduced at trial, the court, as the trier of fact, reason-

ably could infer that Luis' past legal issues supported the department's contention that the respondent was at risk of further domestic violence.[13] Accordingly, there is evidence in the record to support the court's assessment of the risks attendant to the respondent's relationship with Luis.

In addition, contrary to the respondent's assertion, the court was permitted to give little weight to the evidence "that none of the service providers working with [the respondent] while she was living with Luis . . . had any concern that there was domestic violence in the relationship." "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Citations omitted; internal quotation marks omitted.) *In re Carissa K.*, 55 Conn. App. 768, 781–82, 740 A.2d 896 (1999). Although the trial court may rely on expert testimony, it ultimately must make its own independent determination as to the best interest of the child. See *In re Jeisean M.*, 270 Conn. 382, 398, 852 A.2d 643 (2004) ("[a]lthough we often consider the testimony of mental health experts . . . such expert testimony is not a precondition of the court's own factual judgment as to the child's best interest" (citations omitted; internal quotation marks omitted)). In sum, we must defer to both the court's weighing of the testimony presented and its independent factual determination as to what was in Aubrey's best interest as long as they are supported by evidence in the record.

Of note, the record contains evidence of the respondent's failure to disclose domestic violence in her relationships on previous occasions. Further, there was testimony that the respondent would not permit an in-person meeting between the department and Luis. Accordingly, the court had evidence that supported the department's concern that there was a risk of domestic violence in the respondent's relationship despite the testimony of the respondent's service providers. Therefore, we cannot conclude that the court's finding regarding the respondent's relationship with Luis and its indication of her inability to be "trusted with the health and well-being of young children" was clearly erroneous. There is evidence in the record that supports the court's finding, and we are not left with a definite and firm conviction that a mistake has been made.

## B

Second, the respondent generally disputes the court's finding that "[t]he clear and convincing evidence also shows that [the respondent] was unable to appropriately address [her presenting issues of substance abuse, mental health, parenting deficits, domestic violence, and a failure to complete and benefit from counseling and services] by the time of the filing of the [termination of parental rights] petition or by the time of the . . . trial."

In arriving at this conclusion, the court discussed the respondent's participation in several treatment programs, noting that the respondent "has undertaken some treatment." We agree with the respondent that the court understated the respondent's efforts at rehabilitation. The evidence presented at trial indicated that the respondent participated in and successfully completed all treatment and services to which she was referred by the department and was deemed by every service provider to have made progress and to have gained insight surrounding her mental health needs, substance abuse, and domestic violence.

In particular, the record demonstrates that the respondent had maintained her engagement with CMHA since December, 2019, and had "successfully completed CMHA's Adult Intensive Outpatient Program . . . and Jail Diversion for Women program. [The respondent] continue[d] to engage in biweekly individual sessions and medication management to address her diagnoses of [post-traumatic stress disorder] and major depressive disorder, severe, and its impact on [the respondent's] cycle of intimate partner violence . . . victimization, and parenting capacities."

The respondent also participated in dialectical behavior therapy[14] groups from March, 2021, through May, 2021, once per week for one and one-half hours. According to the department social study in support of termination of parental rights, the respondent was "reportedly one of the most actively engaged participants." In addition, the respondent engaged in Circle of Security and Triple P Parenting services through Catholic Charities from July 15, 2020, through January 6, 2021. A parent educator with the program reported to the department that the respondent was able to process information effectively and relate it to her own parenting experiences.

In June, 2021, Cormier, the respondent's current clinician, reported to the department that the respondent was doing well in her sessions and had demonstrated insight and self-awareness. She stated that the respondent had processed how intimate partner violence was related to her current legal involvement and "[connected] the dots" as to how intimate partner violence impacted her adult life and led to her children entering

the department's care. At trial, Cormier testified that she would not classify the respondent as "high risk in relation to her mental health, substance use, [or] legal involvement." Cormier further testified that the respondent soon would graduate from the jail diversion program and step down to a lower level of care due to her improvements.

The court's minimization of the aforementioned evidence does not, however, undermine its finding that the respondent was unable and/or unwilling to benefit from the services offered by the department. Indeed, there was evidence in the record that supported the court's finding that the respondent did not address her underlying issues sufficiently by the time of the trial.

Specifically, Baldwin testified that "throughout the life of this case it appears that [the respondent] has done really well at going to services and engaging in services, but when it comes to demonstrating the newly learned coping skills, [the respondent's] decisions or her judgment has left the department with concerns as it relates to parenting, [intimate partner violence], and her mental health." Baldwin further testified that, "it is the department's understanding that [the respondent's] choice of men and the predicaments that she has found herself in is a symptom of her mental health hygiene, which is why the department has communicated with CMHA asking that [the respondent] intentionally explore how her childhood maltreatment and her mental health has impacted her adult life and her parenting capacities as well as her choice in her intimate relationships." Finally, Baldwin testified that "the biggest concern [for the department] is that it appears by [the respondent's] decisions that she is not demonstrating that she is really intentionally engaged in services. And I say that because, not that she chose to get into a relationship, but I think from the department's perspective it is a concern that her choices would not—that Aubrey and Amelia were not at the forefront of her decision making. And that is as evidenced by Aubrey reportedly having some anxiety around having knowledge [that the respondent] is engaged to another man."

That the court placed greater weight on Baldwin's testimony than Cormier's does not mean its finding was clearly erroneous. The court, as the finder of fact, was "the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . [T]he trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible." (Citation omitted; internal quotation marks omitted.) *In re Carissa K.*, supra, 55 Conn. App. 781–82. Therefore, because there is evidence in the record to support the court's finding regarding the respondent's failure to appropriately address her various issues, that finding is not clearly erroneous.

Moreover, assuming, arguendo, that the court's find-

ing that the respondent failed to appropriately address her presenting issues was clearly erroneous, that alone does not support the contention that the court's best interest determination was clearly erroneous. "As we have stated previously, the court's inquiry in the dispositional phase of the proceeding was properly focused on whether termination of the respondent's parental rights was in the children's best interest." *In re Omar I.*, 197 Conn. App. 499, 586, 231 A.3d 1196, cert. denied, 335 Conn. 924, 233 A.3d 1091, cert. denied sub nom. *Ammar I.* v. *Connecticut*, U.S. , 141 S. Ct. 956, 208 L. Ed. 2d 494 (2020). "The respondent's efforts to rehabilitate, although commendable, speak to [her] own conduct, not the best interests of the child." *In re Daniel A.*, 150 Conn. App. 78, 104, 89 A.3d 1040, cert. denied, 312 Conn. 911, 93 A.3d 593 (2014); see id. (court's finding that father made efforts to rehabilitate himself did not undermine court's best interest determination).

Further, whatever progress a parent arguably has made toward rehabilitation is insufficient to reverse an otherwise factually supported best interest finding. See *In re Malachi E.*, supra, 188 Conn. App. 445–46 ("[a]lthough the respondent directs our attention to other findings that are more favorable to her position, specifically . . . that the respondent was making progress in her rehabilitation, these facts do not provide us a basis to reverse the court's determination"); see also *In re Daniel A.*, supra, 150 Conn. App. 104. Even in cases that consider the rehabilitative status of the parents, "the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Ryder M.*, supra, 211 Conn. App. 814. A determination with respect to rehabilitation is not solely dependent on a parent's technical compliance with specific steps but rather on the broader issue of whether the factors that led to the initial commitment have been corrected. See *In re Omar I.*, supra, 197 Conn. App. 575.

In addition, "[a]lthough commendable, any continuing efforts made by the respondent to advance [her] rehabilitation do not outweigh the other factors considered by the court with respect to whether termination of the respondent's parental rights was in [the child's] best interest." *In re Ryder M.*, supra, 211 Conn. App. 822; see also *In re Anaishaly C.*, 190 Conn. App. 667, 692, 213 A.3d 12 (2019) (court properly determined that termination of respondents' parental rights was in children's best interests when respondents "successfully complet[ed] some programs" but were "unsuccessful, or noncompliant, with others" (internal quotation marks omitted)), cert. denied, 345 Conn. 914, A.3d (2022); *In re Malachi E.*, supra, 188 Conn. App. 445–46 (court's finding that respondent was making progress in rehabilitating herself did not undermine

court's determination that termination of respondent's parental rights was in child's best interest, which was supported by other unchallenged findings).

In the present case, the record demonstrates that other factors considered by the court with respect to whether termination of the respondent's parental rights was in Aubrey's best interest outweighed the continuing efforts made by the respondent to advance her rehabilitation. Specifically, there was an abundance of evidence presented relating to Aubrey's specific needs, which supports the court's conclusion that the respondent would be unable to provide an environment that would meet those needs. As a result of the trauma Aubrey had experienced, specifically her exposure to domestic violence, witnessing the abuse of her sister, and witnessing sexual behavior between adults, Aubrey requires extensive and ongoing therapeutic and clinical services. Aubrey has been diagnosed with unspecified trauma and stressor related disorder and adjustment disorder.

Since her removal from the respondent's care in June, 2019, Aubrey has been placed with several therapeutic foster homes. From December, 2020, through the trial, Aubrey had remained with one foster family. Aubrey's behavioral issues appeared to have reduced in her new foster home. Baldwin testified that, at the time of trial, Aubrey was the most stable that she had ever been, and there was "significant potential" for regression should she be returned to the respondent's care. Notably, the record contained evidence that "resiliency was a strength of Aubrey's and . . . she would benefit from continued stability in caregivers, routine, and environment to ensure that she felt a strong level of safety." The court also heard testimony that Aubrey referred to her foster parents as "mommy and daddy" and that the foster parents were willing to adopt both Aubrey and Amelia.

Of significance is the continuity that Amelia has provided to Aubrey's life. Aubrey has had her younger sister at her side with each foster placement. Reports by Aubrey's clinicians and the department case worker noted Aubrey's protectiveness for her sister. At trial, Baldwin testified that, based on clinical recommendations, "both Amelia and Aubrey . . . have generational separations with family which has impacted them on their adult life. So, if [the department has] the opportunity to keep these children together despite the adverse experience that they have been subjected to . . . the department feels that . . . it remains in their best interest." Given the protective order prohibiting the respondent from having contact with Amelia, should Aubrey return to the respondent's care, Aubrey's contact with Amelia would likely cease or be reduced dramatically.

Thus, the record supports the court's finding that Aubrey's need for permanency, stability, and continuity

of environment outweighed the benefits of maintaining a connection with the respondent. See *In re Daniel N.*, 163 Conn. App. 322, 135 A.3d 1260 (termination of parental rights was in child's best interest where child had multiple placements, had been hospitalized twice for psychiatric issues, would suffer significantly if moved again, and developed relationship with foster parents), rev'd on other grounds, 323 Conn. 640, 150 A.3d 657 (2016); *In re Janazia S.*, 112 Conn. App. 69, 79–80, 961 A.2d 1036 (2009) (termination of parental rights was in child's best interest where child had made tremendous psychological and behavioral progress since placement in therapeutic foster home, was bonded to foster parents, referred to foster parents as mom and dad, and had positive relationships with others in home); *In re Deana E.*, 61 Conn. App. 185, 195, 763 A.2d 37 (2000) (termination of parental rights was in children's best interests where children suffered from psychological and behavioral problems, lived in secure foster home, attended therapy and counseling sessions, and bonded with foster family, and foster parents were willing to adopt children).

The respondent further points to Baldwin's testimony that visits between the respondent and Aubrey "go great" and that the department had no concerns regarding the visits. With respect to the respondent's continued and meaningful contact with Aubrey, "[a]s this court has explained, the appellate courts of this state consistently have held that even when there is a finding of a bond between [a] parent and a child, it still may be in the child's best interest to terminate parental rights." (Internal quotation marks omitted.) *In re Ryder M.*, supra, 211 Conn. App. 821; see also *In re Sequoia G.*, 205 Conn. App. 222, 231, 256 A.3d 195 ("the existence of a bond between a parent and a child, while relevant, is not dispositive of a best interest determination" (internal quotation marks omitted)), cert. denied, 338 Conn. 904, 258 A.3d 675 (2021). That a bond may exist between the respondent and Aubrey does not undercut the court's best interest determination in light of the myriad of other considerations taken into account by the court in reaching its ultimate conclusion. The court found that "Aubrey [is] entitled to the benefit of ending, without further delay, the period of uncertainty that [she] has lived with as to the unavailability of [her] biological parents as caretakers." This is an important factor that the court properly considered.

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached." (Internal quotation marks omitted.) *In re Omar I.*, supra, 197

Conn. App. 584; see also *In re Jacob M.*, supra, 204 Conn. App. 790 ("[w]e will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court" (internal quotation marks omitted)). As we have stated previously, the dispositional phase of a termination of parental rights proceeding centers on the best interest of the child, not the conduct or improvements of the parent. The record here supports the court's finding that, despite the respondent's rehabilitation progress and bond with Aubrey, other pertinent factors indicate that the respondent would not be able to provide an environment to meet Aubrey's needs and that Aubrey's interests would be best served by the termination of the respondent's parental rights.[15] Accordingly, we conclude that the court's determination that termination of the respondent's parental rights was in Aubrey's best interest was not clearly erroneous.

## II

The respondent next contends that "[t]he court's assessment of Aubrey's prospects for permanency in [the department's] care ignores the evidence." Specifically, the respondent argues that the court failed to consider that Aubrey had been in at least five foster placements, some of which were preadoptive, at the time of trial. We disagree.

Although the court did not discuss Aubrey's multiple foster placements, there was an abundance of evidence presented to support the court's determination that terminating the respondent's parental rights would provide Aubrey with permanency, continuity, and stability in her life and would put an end to the period of uncertainty. In particular, the record contains evidence relating to Aubrey's emotional, mental, and physical improvements while residing in a stable therapeutic foster home environment in addition to the testimony of Baldwin about the department's concern that Aubrey would regress should she return to the care of the respondent. "We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Omar I.*, supra, 197 Conn. App. 584.

Further, "the balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . Although a judge [charged with determining whether termination of parental rights is in a child's best interest] is guided by legal principles, the ultimate decision [whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections

in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript." (Internal quotation marks omitted.) *In re Nevaeh W.*, 317 Conn. 723, 740, 120 A.3d 1177 (2015).

Affording the appropriate deference to the court's findings, our review of the record leads us to conclude that the court's best interest determination was not clearly erroneous. The combination of the court's unchallenged and not clearly erroneous factual findings regarding Aubrey's therapeutic needs, the department's concern for Aubrey's potential regression should she return to the respondent's care, and the need for the child to have stability in her life support the court's determination. Although the respondent directs our attention to her own therapeutic improvements, these facts do not provide a basis to reverse the court's best interest determination. Accordingly, we decline the respondent's invitation to reweigh the evidence and, instead, conclude that the court's best interest determination was factually supported and legally correct.[16]

### III

Finally, the respondent contends that "[t]he facts of this case are unusual and should leave this court with the definite and firm conviction that a mistake has been made." In particular, the respondent argues that the facts of this case stand out from other terminations involving similar allegations of harm because (1) the trial court's conclusions about the respondent's possible future risk to Aubrey were not supported by a clinical opinion, (2) it is rare in our case law to terminate the parental rights of a parent who has participated in all referred services and who has been determined to have benefitted from those services, (3) unlike other cases involving parents who allowed their children to be exposed to harm by others, there was no evidence that the respondent returned to a prior abusive relationship or entered into a new abusive relationship, and (4) there was a strong bond between Aubrey and the respondent. We are not persuaded.

Although we recognize that the trial court did not discuss the admirable progress the respondent has made in treatment, we are not left with a definite and firm conviction that a mistake has been made. As stated previously, due to the trauma she has experienced, Aubrey requires extensive and ongoing therapeutic and clinical services to treat her unspecified trauma and stressor related disorder and her adjustment disorder. In her most recent foster home, Aubrey's behavioral issues have apparently reduced because of the consistent and in-depth therapeutic services she has engaged in with the facilitation of her foster parents. After several years of minimal progress, there have been no recent incidences of Aubrey engaging in malicious or aggressive behavior toward her foster siblings or Amelia. There is evidence in the record indicating that

Aubrey has bonded with this foster family, calling her foster parents "mommy and daddy." The record also demonstrates that the foster parents are willing to adopt both Aubrey and Amelia.

These facts strongly support the court's best interest determination, and we will not second-guess the court's assessment that Aubrey's need for permanency, stability, and continuity of environment outweighs the benefits of maintaining a connection with the respondent. As long as the respondent's parental rights still exist, allowing potential for change, Aubrey will be unable to truly settle in and attach to her foster parents. See *In re Daniel N.*, supra, 163 Conn. App. 336; *In re Janazia S.*, supra, 112 Conn. App. 79–80; *In re Deana E.*, supra, 61 Conn. App. 195. "[W]e will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court." *In re Shane M.*, supra, 318 Conn. 593. Accordingly, we are not left with a definite and firm conviction that a mistake has been made.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that party's identity may be ascertained.

** November 21, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of Aubrey's father, the respondent Jacob K. Because Jacob K. is not involved in this appeal, our references in this opinion to the respondent are to the respondent mother.

[2] General Statutes § 17a-112 (j) (3) (C) provides that a trial court may terminate parental rights if "the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being, except that nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ."

[3] The respondent and Gregory met in 2009 and were involved romantically until Gregory was arrested and incarcerated in 2013. The respondent and Gregory reconnected when Gregory was released in or around 2016. By the time of Amelia's birth, Gregory was reincarcerated.

[4] The respondent entered her plea and was sentenced in the criminal proceedings on January 7, 2020.

[5] Those steps included: "(1) Create and maintain safe, stable, and nurturing environment free from substance abuse, mental health issues, and intimate partner violence. (2) Learn triggers for substance use and develop alternate coping mechanisms through individual and group sessions. (3) Understand impact of substance use and intimate partner violence on present functioning and children. (4) Address trauma history and understand impact on present functioning and parenting skills. (5) Learn and demonstrate age-appropriate parenting, supervision, discipline and developmental expectations. (6) Develop and implement appropriate coping mechanisms to safely address stressors of parenting. (7) Address any identified mental health needs in

individual counseling in order to maintain emotional stability and be a stable resource for child.”

[6] The respondent has not appealed from the judgment terminating her parental rights as to Amelia given the standing criminal protective order prohibiting her from having contact with Amelia until 2099. The court also terminated Gregory’s parental rights as to Amelia, and he has not challenged that judgment on appeal.

[7] General Statutes § 17a-112 (k) provides: “Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child’s parents, any guardian of such child’s person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent’s circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.”

[8] The court noted that the department was unable to provide services to reunify the respondent with Amelia due to the standing criminal protective order prohibiting the respondent from having contact with Amelia.

[9] The respondent’s attendance at an intensive domestic violence program was neither a specific step nor a mandate from the department.

[10] “ ‘Family with service needs’ means a family that includes a child who is at least seven years of age and is under eighteen years of age who, according to a petition lawfully filed on or before June 30, 2020, (A) has without just cause run away from the parental home or other properly authorized and lawful place of abode, (B) is beyond the control of the child’s parent, parents, guardian or other custodian, (C) has engaged in indecent or immoral conduct, or (D) is thirteen years of age or older and has engaged in sexual intercourse with another person and such other person is thirteen years of age or older and not more than two years older or younger than such child . . . .” General Statutes § 46b-120 (3).

[11] Consistent with our precedents, we decline to apply the evidentiary sufficiency standard for the following reasons. First, we decline to adopt a standard of review for a best interest determination that our Supreme Court has yet to adopt. Second, despite the respondent phrasing her claim as a sufficiency of the evidence claim, both parties on appeal agree that the clearly erroneous standard of review applies to the present claim. Third, the evidence in the present case supports the court’s determination under either standard because, as articulated by this court in *In re Nioshka A. N.*, “if the evidence upon which we have relied in finding that the trial court’s best interest determination was not clearly erroneous were considered under the evidentiary sufficiency standard, and, thus, was construed in the light most favorable to upholding the trial court’s best interest determination . . . that evidence, so construed, would be sufficient to prove by clear and convincing evidence that termination of the respondent’s parental rights was in the best interest of the child.” (Citation omitted.) *In re Nioshka A. N.*, supra, 161 Conn. App. 637 n.9.

[12] Relying on *In re Vincent B.*, 73 Conn. App. 637, 644–45, 809 A.2d 1119 (2002), the respondent argues, as a preliminary matter, that the court improperly made “conclusive assumptions about a parent’s future ability to care for [her] children based only on prior bad conduct and without considering

present, sustained good conduct." Notably, however, the court expressly considered the respondent's present involvement with several treatment programs as well as the testimony of the respondent's service providers and current case worker in concluding that the termination of the respondent's parental rights was in the best interest of Aubrey.

[13] We note that, although the court stated that "[the respondent] has done her best to prevent [the department] from getting any further information about Luis," Baldwin testified that she engaged in several virtual meetings with Luis. Further, documentary evidence in the record establishes that Luis completed a mental health evaluation per the department's request and that his evaluation contained no recommendations for further services. Nevertheless, Baldwin testified that the respondent denied the department access to Luis when Baldwin made efforts to see him in person in April, 2021.

[14] "Dialectical [b]ehavior [t]herapy is an evidence-based psychotherapy to treat borderline personality disorder and is useful in treating patients seeking change in behavioral patterns such as substance abuse and domestic or non-domestic violence against others. It is a process in which the therapist helps the patient find and employ strategies and ultimately synthesize them to accomplish consistently the defined ultimate goal and is used to treat borderline personality disorders and addictive personality disorders. To be successful, it demands honesty both from the patient and the clinician." (Internal quotation marks omitted.) *In re Xavier H.*, 201 Conn. App. 81, 90 n.3, 240 A.3d 1087 (2020).

[15] In addition, we are not left with a definite and firm conviction that a mistake has been made. See part III of this opinion.

[16] We note that the respondent, in her reply brief, advanced a related argument: "Had the trial court rendered conclusions reasonably connected to the evidence concerning other relevant factors, this court might reasonably conclude that the court weighed all the evidence and concluded that Aubrey's needs were simply too great and that no amount of rehabilitation on [the respondent's] part could ever put her in a position to parent Aubrey. But that is not the decision that this court must consider on appeal. Rather, the trial court's conclusions on [the respondent's] circumstances at the time of trial were wholly unmoored from the evidence presented. No insight can be gained into a trial court's weighing of different factors when its conclusions are not supported by the evidence, and as such, this court must not speculate on how the trial court balanced different factors." (Emphasis omitted.) Because we have determined the court's findings were not clearly erroneous, the court's conclusions were reasonably connected to the evidence. Accordingly, this argument fails.